# UNITED STATES DISTRICT COURT
### for the
### District of Colorado

| | |
|---|---|
| **In the Matter of the Search of:** | ) |
| | ) |
| Samsung Galaxy cellular phone with | )  Case No. 21-sw-00912-NRN |
| associated phone number 719-406-0980 and | ) |
| more fully described in Attachment A, | ) |
| attached hereto. | ) |

## APPLICATION FOR A SEARCH WARRANT

I, Marcus Juliano, a federal law enforcement officer for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit located in the _____State and_____ District of _____Colorado_____, there is now concealed:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to distribute controlled substances |
| 18 U.S.C. § 922(g)(1) | Felon in possession of a firearm |
| 18 U.S.C. § 843 | Use of a communication facility to facilitate a drug  felony |

The application is based on these facts:

**X**   Continued on the attached affidavit, which is incorporated by reference.
☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Marcus Juliano*
*Agent's signature*

Marcus Juliano, Task Force Officer,  FBI
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: ___09/01/2021___

*Judge's signature*

City and state: ___Denver, CO___

Hon. N. Reid Neureiter, U.S. Magistrate Judge
*Printed name and title*

**ATTACHMENT A**

**<u>DESCRIPTION OF ITEM TO BE SEARCHED</u>**

The DEVICE is a Samsung Galaxy cellular phone, model SM-A326U, with IMEI 355561776930432 and associated telephone number 719-406-0980.

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED FOR**

Any and all evidence, fruits, and instrumentalities of the following violation: 21 U.S.C. § 841 (Possession With Intent to Distribute and Distribution of a Controlled Substance) and 846 (Conspiracy to Distribute a Controlled Substance), 18 U.S.C. § 922(g)(1) (Possession of a Firearm and/or Ammunition by a Prohibited Person), and 21 U.S.C. § 843(b) (Use of a Communication Facility to Facilitate a Drug Felony) (All hereinafter referred to as "Subject Offenses"). Specifically, not but not limited to the following:

1.  During the execution of the search of the DEVICE described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of John CRUZ to the fingerprint sensor of the DEVICE for the purpose of attempting to unlock the device via fingerprint identification in order to search the contents as authorized by this warrant.

2.  Any and all information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of the Subject Offenses;

3.  Any and all address books, names, and lists of names and addresses of individuals who may have been contacted by use of the DEVICE or by other means for the purpose of committing violations of the Subject Offenses;

4.  Any and all information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of the Subject Offenses;

5.  Any and all information, records, documents, invoices and materials, in any format or medium, that concern e-mail accounts, online storage, or other remote computer storage pertaining to violations of the Subject Offenses;

6.  Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of the Subject Offenses or that show who used, owned, possessed, or controlled the (s);

7.  Any and all information, documents, records, photos, videos, or correspondence, in any format or medium, pertaining to use or ownership of the (s), or that aid in the identification of persons involved in violations of the Subject Offenses;

8.  Credit card information, bills, and payment records pertaining to violations of the Subject Offenses;

9.      Descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of the Subject Offenses;

10.     Evidence of who used, owned, or controlled the  to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence;

11.     Evidence of the attachment to the DEVICE of other storage or similar containers for electronic evidence;

12.     Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DEVICE;

13.     Evidence of how and when the DEVICE was used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

14.     The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the DEVICE;

15.     Passwords, encryption keys, and other access that may be necessary to access the Device; and

16.     Contextual information necessary to understand the evidence described in this attachment.

17.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

## INTRODUCTION AND AGENT BACKGROUND

I, Marcus Juliano, a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI), being duly sworn, state as follows:

1. I, Marcus Juliano, am a TFO with the Federal Bureau of Investigation (FBI), United States Department of Justice, and have been so employed since September of 2020. I am presently a member of the FBI Denver Field Division and am assigned to the Southern Colorado Violent Gang Safe Streets Task Force. Additionally, I am a Detective assigned to the Special Investigative Division (SID) of the Pueblo Police Department (PPD) and have been employed by the PPD since 2010. As a TFO, my duties and responsibilities include conducting criminal investigations of individuals and entities for possible violations of federal laws, particularly those laws found in Title 18 and Title 21 of the United States Code (U.S.C.). I have previously participated in investigations which resulted in the arrests, searches, and seizures of individuals and property. I have participated in the use of cooperating informants, undercover agents, pen register/trap and trace devices, video surveillance, wiretaps, GPS tracking devices, search warrants, and audio surveillance, among other law enforcement techniques, in the course of my career with FBI and PPD. Additionally, I have participated in numerous controlled buys of firearms and narcotics from targets of law enforcement investigations. I have conducted large-scale gang-related investigations, as well as proactive and reactive investigations where individuals possess narcotics with the intent to distribute them. I have investigated drug conspiracies and am familiar through experience and training how distributors operate and conduct their narcotics distribution networks. Based on my training and experience, I am familiar with methods used by the criminal element in furtherance of a variety of criminal activities.

2. I am also experienced in the analysis of call detail records provided by cellular telephone carriers. I have personally reviewed several sets of call detail records during the course of my career. I have used the information from these analyses to understand a user's pattern of life based on call activity, have used information from these analyses to establish probable cause for different types of warrants, and have used information to identify new cell phone numbers for suspects.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. The details set forth in this affidavit are from my personal knowledge of the investigation, review of reports and other documents, and/or from conversations with investigators having knowledge of the case. I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841 Distribution/Possessing with Intent to Distribute, 21 U.S.C. § 846 Conspiracy to Distribute, 21 U.S.C. § 843(b) Use of a Communication Facility to Facilitate a Drug Felony, and 18 U.S.C. § 922(g)(1) Possession of a Firearm and/or Ammunition by a Prohibited Person.

## PURPOSE OF SEARCH WARRANT AND AFFIDAVIT

4. This affidavit is submitted in support of an application for a search and seizure of Samsung Galaxy cellular phone currently located in the possession of John CRUZ, more fully described in **Attachment A**, hereinafter the "DEVICE"

5. I submit that the following facts establish probable cause to believe that located in the place described in **Attachment A** are items described in **Attachment B**, those being evidence, fruits, and instrumentalities of the following offenses:  possession of a firearm and/or ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g)(1), possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841 (a) (1), conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846, use of a communication facility to facilitate a drug felony, in violation of 18 U.S.C. § 843.

6. Because this affidavit is being submitted for the limited purpose of securing a premises search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violation listed in paragraph 2, more fully described in **Attachment B**, are presently located at/in the DEVICE, more fully described in **Attachment A**.

7. The information contained within the affidavit is based on my training and experience and is known to your Affiant personally or has been imparted your Affiant by other law enforcement officers involved in this investigation.

8. In summary, and as set forth below, the FBI and Pueblo Police Department have been conducting a narcotics investigation surrounding the activities of John Cruz for several months.  The investigation has included the use of sophisticated techniques such as Pen Register Trap and Trace Devices, physical surveillance, interviews of some of CRUZ's drug customers, and database searches.  Investigators suspect that CRUZ traffics in significant quantities of illegal drugs and is also unlawfully in possession of firearms.

## INVESTIGATION BACKGROUND

### *John Kenneth CRUZ:  Resident of TARGET LOCATION*

9. I have reviewed a criminal history for John Kenneth CRUZ, date of birth 03/25/1962, and learned the following information related to his six prior felony convictions.  CRUZ has also been arrested multiple times and has other misdemeanor cases that are not included below.

    a. In Larimer County Court Case 2009CR347, CRUZ plead guilty to attempted escape, a Class three Felony, and was sentenced to four years in the Colorado Department of Corrections on April 10, 2006.

b. In Pueblo County Court Case 2005CR1081, CRUZ plead guilty to 2nd Degree Burglary of a dwelling, a class three felony, and was sentenced to eight years in the Colorado Department of Corrections, concurrent with Pueblo County 2005CR55.

c. In Pueblo County 2005CR55, in which CRUZ plead guilty to Theft, a class four felony, and was sentenced to eight years in the Colorado Department of Corrections.

d. In Pueblo County Court Case 1999CR98, CRUZ plead guilty to Escape, a class four felony, and was sentenced to two and half years in the Colorado Department of Corrections. The sentence was set concurrent with Pueblo County 94CR1357 and 1994CR1483,

e. In Pueblo County 1996CR800, CRUZ plead guilty to Attempted Escape, a Class four Felony, and was sentenced to two years Department of Corrections, concurrent with Pueblo County 1993CR1483 and 1994CR1357.

f. In Pueblo County 1994CR1357, CRUZ plead guilty to Criminal Attempt to Commit Possession of a Controlled substance, a class four felony, and was sentenced to three years in the Colorado Department of Corrections.

10. I have requested information from the Colorado Department of Revenue related to CRUZ's earning. I have reviewed that information and found that CRUZ had no reported wages from 2016 to 2021.

11. Although I suspect that CRUZ's income is primarily from the distribution of illegal narcotics, I know from prior investigations that sometimes individuals do not report wages to the State of Colorado for reasons such as self-employment, or as a 1099 wage earner. The fact that CRUZ does not have reported earnings is not intended to be the sole supporting fact in support of probable cause for the requested warrant.

## SOURCE OF INFORMATION #1 ("SOI1")

12. In August of 2021, the Federal Bureau of Investigation ("FBI") interviewed a Source of Information ("SOI1") with substantial knowledge of the distribution of illegal narcotics, particularly associated to CRUZ. SOI1 also has substantial knowledge of others involved in narcotics trafficking in Pueblo, Colorado.

13. To my knowledge, SOI1 has not cooperated with law enforcement in the past, and, therefore, does not have a history of being either reliable, or unreliable. SOI1 has a prior criminal history and has been convicted of narcotics related offenses in the past. Specifically, SOI1 has been convicted felony possession of controlled substances. Your Affiant has not included the specific court cases related to these charges to help protect SOI1's identity. SOI1 provided the information after being advised of his/her Miranda rights and waiving them. SOI1 expressed considerable concern about retaliation from CRUZ and his associates, should his/her name be provided. In this particular set of circumstances, I submit that SOI1 prior

history of involvement with narcotics lends credibility to his/her knowledge of drug trafficking.

14. SOI1 was recently observed during physical surveillance of CRUZ, and based on my training and experience, reasonably believe that SOI1 and CRUZ were participating in illegal narcotics transaction. SOI1 was followed away from the narcotics transaction location and arrested on an outstanding felony warrant, which is being prosecuted by the State of Colorado.

15. SOI1 provided the information below in the hope of receiving consideration related to pending criminal charges. It should be noted that SOI1 provided the information about CRUZ unprompted, and law enforcement did not specifically illicit the information from SOI1. Rather, SOI1 volunteered CRUZ as a large source of narcotics in Pueblo, Colorado and was unaware of the pending investigation into CRUZ.

16. SOI1 stated that he/she had a long history with CRUZ and was fully aware of how CRUZ's narcotics distribution organization operated. SOI1 also stated that he/she has conducted narcotics transaction for CRUZ and has even picked up narcotics from sources of supply for CRUZ. SOI1 was familiar with many different types of illegal drugs, the tradecraft of large volume drug dealers, the street prices of illegal drugs, the identification of illegal drugs, and the types of equipment used in furtherance of illegal drug sales.

17. SOI1 also stated that he/she has knowledge related to firearms, including specific platforms of firearms, and would be able to tell the difference between a real firearm, and an airsoft or BB gun.

18. During the interview, SOI1 was asked to provide CRUZ's phone number. He/she provided the number 719-406-0890 from memory. CRUZ's phone number is 719-406-0980. From the context of the interview and broader investigation, your Affiant believes that SOI1 was familiar with CRUZ's phone number but mistakenly transposed the eighth and ninth digits of the number. Investigators were already familiar with CRUZ's cellular phone number, particularly from previous information provided by cooperating individuals, and because courts in this District have authorized prior legal process for Pen Register Trap and Trace devices with cell tower location data on CRUZ's number on. On 06/09/2021, in the District of Colorado case number 21-sw-000665-NYW, United States Magistrate Judge Nina Y. Wang, authorized the first 30 days and the next 30 days on 07/09/2021. On 08/09/2021, United States Magistrate Judge Kristen L. Mix, extended the warrant for an additional 30 days. I can confirm that the location data provided by T-Mobile corresponded with CRUZ's location during the physical surveillance I have conducted.

19. SOI1 has provided information related to other individuals that was independently corroborated by law enforcement. Some, but not all of that information is included in this affidavit. SOI1 identified wanted individuals already known to law enforcement and addresses that law enforcement was aware of as well. SOI1 was familiar with residential addresses other than CRUZ's current residence, street names (monikers) of known gang members, drug dealers, vehicles associated with individuals, and social relationships between known individuals.

20. SOI1 has positively identified other drug dealers previously known to the FBI and relevant in active drug investigations. Your Affiant has left the names of those drug dealers out of this affidavit in order to protect the integrity of ongoing investigations. SOI1's information accurately compared to other confidential source reporting, and historical information provided by different law enforcement agencies, specifically related to narcotics trafficking.

21. Since SOI1 was familiar with these types of innocent facts and that information proved to be accurate, it is reasonable to believe that SOI1 would also have accurate information related to CRUZ's illegal activities.

22. SOI1 appears to have provided reliable information and your Affiant is not aware of any false information SOI1 has provided. Additionally, Your Affiant is not aware of any vendetta or grudge that SOI1 holds against any person(s) named in this affidavit.

23. Based on the information provided in this section about SOI1, your Affiant believes the information provided by SOI1 is reliable, and that independent Police work and independently obtained information corroborates SOI1's information.

### SOI1 KNOWS GUNS AND DRUGS ARE INSIDE THE SUBJECT LOCATION

24. SOI1 provided investigators with information related to CRUZ. SOI1 stated that CRUZ is one of the larger sources of narcotics supply in Pueblo, Colorado. SOI1 has personally seen CRUZ sell and purchase narcotics as recently as August 11, 2021. SOI1 has also helped CRUZ sell narcotics and count the cash CRUZ has made from the sale of narcotics.

25. SOI1 stated that he/she has known CRUZ for the last five years and has been to CRUZ's previous residence multiple times. SOI1 was also able to explain the reason CRUZ left that residence and moved into his current residence (2424 Plain St. Pueblo, Colorado) within the last two months.

26. SOI1 stated that he/she has been to CRUZ's residence over 20 times in the last two months and as recent as the first part of August 2021. SOI1 stated that every time he/she has been to the residence he/she has seen narcotics and knew where CRUZ maintained his narcotics supply in the residence.

27. Specifically, SOI1 stated that CRUZ has a safe that is about two feet tall and wide in his bedroom. SOI1 described to me how to walk from the front door to CRUZ's bedroom where the safe was kept. SOI1 stated that he/she has seen the inside of the safe on numerous occasions and was aware that CRUZ stored narcotics, money and guns in the safe.

28. SOI1 stated that he/she often times has to call CRUZ, because CRUZ receives so many text messages it is difficult for him to respond promptly. SOI1 also stated that CRUZ's receives significant amounts of texts and phone calls, through all hours of the day.

29. SOI1 stated that he/she has not seen CRUZ carrying a firearm but has seen CRUZ with handguns at his residence. SOI1 was aware that CRUZ traffics in both firearms and narcotics.

30. SOI1 stated that he/she was aware that if CRUZ believed he was being targeted by law enforcement his standard operating procedure was to bury his narcotics supply in a location, usually behind the house. CRUZ would then monitor the buried narcotics from a window or with a camera.

## ARREST AND INTERVIEW OF JOSHUA WISTHOFF

31. On November 23, 2020, detectives with the PPD SID arrested Joshua WISTHOFF, date of birth 4/22/86, a known Ace Street Gang member. At the time of his arrest, WISTHOFF was in possession of illegal narcotics. WISTHOFF was transported to PPD. During a formal interview, and after being advised of his Miranda rights, waiving those rights, and agreeing to speak with investigators without an attorney present, he provided the below information. This interview was audio and video recorded.

32. Prior to WISTHOFF's arrest, he was known by investigators to be actively involved in the distribution of illegal drugs, namely methamphetamine and heroin. I submit that because of WISTHOFF's history as a drug dealer, he is familiar with different types of illegal drugs, the tradecraft of large volume drug dealers, the street prices of illegal drugs, the identification of illegal drugs, and the types of equipment used in furtherance of illegal drug sales. I submit that this make his statement related to the drug trafficking of other more reliable.

33. WISTHOFF also had extensive history with the PPD. WISTHOFF has been arrested 27 times by the Pueblo Police Department and has 91 documented incidents/encounters in the Pueblo Police Department Computer System. WISTHOFF has the following active "alerts" in the Pueblo Police Department Computer System: Drug dealer, known felon, parolee, provides false names, and a documented Ace Gang Member.

34. Patrol officers/detectives will place "alerts" on individuals during investigations and encounters to have them flagged for specific reasons. These alerts are reviewed by the records section prior to being in the system, and primarily provide additional information for the purposes of Officer Safety.

35. In addition to the information included below, Wisthoff provided information related to other gang activity that was independently corroborated by law enforcement. For example, Wisthoff identified gang members already known to law enforcement. Wisthoff was familiar with residential addresses, street names (monikers) of known gang members, vehicles associated with gang members, and social relationships between gang members.

36. Since Wisthoff was familiar with these types of innocent facts and that information proved to be accurate, it is reasonable to believe that Wisthoff would also have accurate information related to illegal activities.

37. Wisthoff appears to have provided reliable information and I am not aware of any false information Wisthoff has provided. Additionally, I am not aware of any vendetta or grudge

that Wisthoff holds against any person(s) named in this affidavit. Wisthoff provided information to law enforcement with the hopes of leniency of his pending criminal charges. Wisthoff was not provided any monetary compensation and was not made any promises by the Government.

38. WISTHOFF informed detectives one of his main sources of narcotics supply was CRUZ, and he would contact CRUZ via telephone on the same number confirmed to belong to CRUZ and the same as the number provided by SOI1 (without the transposed digits), and discussed above to communicate the pricing, quantities, and meeting locations to obtain illegal drugs. Wisthoff also stated that he owed CRUZ money.

39. Since Wisthoff was on active parole that November, Pueblo Parole Officer Anita Archuleta requested WISTHOFF's phone be downloaded as per the conditions of his parole. Task Force Officer (TFO) Jeremy Mathews manually downloaded the phone and observed that there was contact with an individual with the contact name "Cruz" in the phone.

40. The phone number associated with CRUZ in Wisthoff's phone was the same number provided later by SOI1 (without the transposed digit). I reviewed the download and observed the following texts between CRUZ and Wisthoff.

41. I have not included all the messages between Wisthoff and CRUZ, however I have not purposely left out any messages that would be exculpatory in nature, or detract from probable cause for the requested warrant. Wisthoff and CRUZ do have some conversations about things other than drugs, which supports their friendly relationship:

  - 11/10/2020 at 2116 hours (sent): "Yo just let me know when outside my brotha….thank you"

  - 11/10/2020 at 2117 hours (CRUZ replied): "Here"

42. On November 13, 2020 at 1258 hours Wisthoff texted CRUZ, "Wts my bro" and "I need some b". No response is observed from CRUZ, but in my training and experience "b" is short for "black" which is a street term used for heroin.

43. On November 15, 2020 at 1949 hours Wisthoff texted CRUZ, "Bring some clear with u my brotha" and "Please and thanks I am here at the carwash". Again, no response was observed from CRUZ, but in my training and experience the word "clear" is synonymous with methamphetamine.

44. It should be noted that on June 18, 2021, I observed CRUZ at a car wash and in my training and experience I observed what was likely a hand-to-hand narcotics transaction between CRUZ and two other individuals. I never observed CRUZ washing his vehicle at any time during his time at the car wash and he appeared to be waiting both before and after the interaction I observed. I was able to locate CRUZ during this surveillance by going to the location provided by T-Mobile in the above mentioned court authorized prior legal process

(See paragraph 15). CRUZ and the DEVICE were in the same location and that the phone number associated with the court order was for the same phone number in Wisthoff's phone under the contact name "Cruz".

45. On November 18, 2020, at 2214 hours Wisthoff texted CRUZ, " Hey wts up my brotha sorry brotha I been drinking with my brothers so if u won't come to me were I am at or I could meet with u in am for sure because I ant doing no runs tonight but I got your money with me brotha… if not I will call u in the morning as soon as I get up or just come to my house let me know". At 2219 hours, CRUZ texted back, "Am is kool". As stated above Wisthoff stated that he owed CRUZ money for drugs, and CRUZ appeared to be content with receiving the drug debt the following day.

46. On March 18, 2021, WISTHOFF was indicted by a Federal Grand Jury in the District of Colorado on 8 counts. Case no. 21-cr-00092-RM. Six of the eight counts were for knowingly and intentionally distribute and possess with intent to distribute a controlled substance.

## PROFFER OF WISTHOFF

47. On May 19, 2021, Wisthoff conducted a proffer. His defense attorney was present for the interview, and Wisthoff agreed to provide nothing but truthful information. During his proffer, he made further statements about CRUZ to FBI SA K.C. Hughes and Task Force Officer Jeremy Mathews, FBI. Wisthoff stated that he had been to CRUZ's residence on Pear Street in Pueblo, CO and had seen two large safes. One of the safes had pounds of narcotics and the other was full of money and guns. To be clear, Wisthoff's information was dated, and the residence on Pear Street is not the current residence of CRUZ. CRUZ moved from the Pear Street address several months prior to the date of this application to the his current residence. Wisthoff's information about CRUZ's safe is similar to SOI1, and independently corroborate each other's statements about CRUZ's use of a safe or multiple safes to facilitate his possession and trafficking of both firearms and controlled substances. Based on Wisthoff and SOI1's information, the safe is reasonably believed to be currently located within the current residence.

48. Wisthoff was aware that that CRUZ got hundreds of pounds of heroin from a source outside of Pueblo. Wisthoff also stated that if CRUZ thought he was being watched by the police he would move everything and go and stay in a hotel with just enough drugs for himself. CRUZ had told Wisthoff that he had several storage units with merchandise and likely more guns, but Wisthoff did not know the location of the units.

## CRUZ WAS THE SOURCE OF SUPPLY FOR JUSTIN MILLER

## ATTEMPTED TRAFFIC STOP ON MARCH 2, 2021

49. On March 2, 2021, I observed a vehicle traveling with fictitious plates in the area of West Northern Avenue and Prairie Avenue, Pueblo, Colorado. I attempted to conduct a traffic stop, but the vehicle fled. Through my investigation discussed below I discovered the driver of that vehicle was Justin MILLER, date of birth 2/27/83.

50. MILLER abandoned the motor vehicle several blocks away from the attempted traffic stop and fled on foot. Detective's searched the area for MILLER and located a backpack containing a sizeable quantity of illegal narcotics. Investigators suspected that MILLER left this backpack on top of shed in a backyard of a residence.  MILLER was able to escape on foot, but through additional investigation, Detectives were able to determine the backpack indeed belonged to MILLER.

## RECOVERY OF MILLER'S CELL PHONE AND ITS CONTENTS

51. I applied for and was granted a search warrant by a judge in the 10th Judicial District of Colorado for the vehicle MILLER was driving and located a cellular phone inside of it. An additional search warrant was applied for and granted for this cell phone and its contents were downloaded and examined. The phone was identified as belonging to MILLER.

52. Inside the cell phone I observed text messages between MILLER and CRUZ's phone.  In summary, the content of the messages was in relation to the distribution of illegal narcotics. CRUZ's phone number was saved as "Kenny Plug" in Miller's cell phone.  Kenny is CRUZ's middle name.  In my training and experience I am aware the term "Plug" is commonly used to describe a narcotics source of supply by drug dealers and drug users.

53. Specifically, I observed the following text messages on the cell phone:

    3/1/21 10:09 P.M. (sent)- Can I meet u

    3/1/21 10:23 P.M. (received from Kenny Plug)- Soon I got blues.

    3/1/21 at 2227 hours (sent)- "They still 10 or cheaper"

    3/1/21 at 2235 hours (sent)- "LMK when to meet"

    3/2/21 at 0014 hours (sent)- "We good to go yet"

    3/2/21 at 0017 hours (received from Kenny Plug)- "lilllet u no asp"

    3/2/21 at 0129 hours (sent)- "Stil"

    3/2/21 at 0130 hours (sent)- "?"

    3/2/21 at 0144 hours (received from Kenny Plug)- "Miss communication but there bringing it"

    3/2/21 at 0239 hours (received from Kenny Plug)- "Going pic it up"

    3/2/21 at 11:59 hours (received from Kenny Plug)- "160 + 850 + 850 + 50= 1910"

    3/2/21 at 1453 hours (sent)- "U cant do better then that 850 that is"

3/2/21 at 1456 hours (sent)- "What I sell it for"

3/2/21 at 1554 hours (received from Kenny Plug)- "Well can do it 825"

3/2/21 at 1611 hours (sent)- "Alright An do u got a oz clear"

54. Through my training and experience "blues" is a slang term referred to as Oxycodone Hydrochloride Pills on the street. These pills are normally blue in color and have the imprints of M and 30 on them. These same pills often also contain fentanyl and are disguised as Oxycodone Hydrochloride Pills. Through my training and experience "clear" is a slang term for methamphetamine. I submit the above messages are discussing the purchase of pills and methamphetamine from CRUZ.

55. Your Affiant completed an arrest warrant for MILLER for several felony charges in relation to the traffic stop.

## THE ARREST AND INTERVIEW OF MILLER

56. I was aware that MILLER had an extensive history with the PPD.  MILLER had been arrested 12 times by the Pueblo Police Department and had 32 documented incidents in the Pueblo Police Department Computer System. MILLER was also a two-time convicted felon.  I am aware that one of those felonies was for narcotics distribution.   MILLER had active "alerts" in the Pueblo Police Department Computer System for the following: drug user, drug dealer, known felon, weapon history, and escape risk/will run.

57. I submit that because of MILLER's history as a drug dealer, he is familiar with many different types of illegal drugs, the tradecraft of large volume drug dealers, the street prices of illegal drugs, the identification of illegal drugs, and the types of equipment used in furtherance of illegal drug sales. I submit that this make his statement related to the drug trafficking of other more reliable.

58. On March 10, 2021 I was able to locate MILLER at his residence located at 2029 Acero Avenue # 80, Pueblo, Colorado. MILLER was taken into custody on his active felony warrant. At the time of his arrest, MILLER was in possession of illegal narcotics.

59. MILLER was transported to the Pueblo Police Department to be interviewed. After being advised of his Miranda rights, waiving those rights, and agreeing to speak with investigators without an attorney present, MILLER provided the following information.  This interview was audio and video recorded.

60. MILLER was questioned about the contact stored on his cellular telephone as "Kenny Plug", and the illegal narcotics located throughout my investigation. Miller identified "Kenny Plug" as John CRUZ and stated he was the main "plug" that he gets his illegal narcotics from. MILLER stated that he contacted him via the same number that SOI1 later provided for CRUZ

(without the transposed digits). MILLER stated CRUZ deals in large amounts of illegal narcotics and is a main source of supply in the city of Pueblo.

61. MILLER appeared to have provided reliable information and I am not aware of any false information MILLER had provided.  Additionally, I am not aware of any vendetta or grudge that MILLER holds against CRUZ. MILLER had provided information to law enforcement with the hopes of leniency of his pending criminal charges.  MILLER was not provided any monetary compensation and was not made any promises by the Government.

## **INTERVIEW OF MICHAELA MONTOYA**

62. On June 4, 2021, I interviewed Michaela Montoya at the PPD.

63. Montoya was never placed in hand cuffs and was aware that she was not under arrest, was free to leave, and any information provided was done voluntarily.  I have included some, but not all, of her statements below.  I am not aware of any vendetta or grudge that Montoya holds against CRUZ, but Montoya did state that she was afraid of CRUZ, and that CRUZ had asked to move into her house.  Montoya stated that she did not want CRUZ to move in and was attempting to move out.

64. Montoya stated she met CRUZ approximately 9 months ago through Joshua Wisthoff, and believed that CRUZ sold illegal drugs. It should be noted that Wisthoff and Montoya know each other, and some of the information Montoya knew about Cruz could have reasonably come from Wisthoff.

65. At the time of the interview Montoya was aware that CRUZ lived on Pear Street. Through my training and experience and previous investigations I was aware that CRUZ lived at 631 Pear Street, Pueblo, Colorado, prior to moving to his current residence.  Additionally, Montoya was aware of the vehicles that CRUZ drove and was able to describe some of them.  I was able to corroborate that CRUZ did indeed own vehicles that matched the descriptions of vehicles provided by Montoya.

66. I asked Montoya how individuals got a hold of CRUZ to purchase narcotics and she stated they call him. Montoya stated he/she had CRUZ's cell phone number in her cell phone. I presented a Pueblo Police Department Cellular Consent Form and Montoya signed the form acknowledging her consent to download her phone. Her cell phone was downloaded.

67. When I reviewed Montoya's phone, I observed the name "Cruz" saved in her phone with the same number SOI1 later provided (without the transposed digits) in the contacts.

68. Montoya stated the last time she contacted CRUZ on that number was on 06/04/2021, and that she had contacted CRUZ to buy heroin. Montoya stated that also on 06/04/2021, she met CRUZ at Loaf N Jug, located at 4800 Thatcher Avenue, Pueblo, Colorado, around 0030 hours to buy a ½ ounce of heroin. Montoya stated that she purchased the narcotics from CRUZ for $425.00 and CRUZ was driving a silver sedan during the sale.

69. Montoya stated that CRUZ had mentioned using storage sheds to hold his valuables and narcotics several times, but never clarified where they were at.  Through conversations with John Cruz Jr., CRUZ's son, date of birth 09/11/1982, in the past, Montoya believed that the

storage units were the units off of Thatcher Avenue, near the Loaf N' Jug, located at 4800 Thatcher Avenue, Pueblo, Colorado.

70. I am aware that Thatcher Avenue Mini Storage is located at 4625 Thatcher Avenue, Pueblo, Colorado. I was later able to confirm that John Cruz did indeed rent both an outside storage spot and an interior container at Thatcher Avenue Mini Storage.

71. Montoya was also aware of narcotics runners for CRUZ, Joseph Hernandez, date of birth 02/04/1965, and Jacob Lucero, date of birth 04/25/1985. Montoya was only able to provide the phone number for Joseph Hernandez. A review of CRUZ's call data records showed that CRUZ indeed had contact with the number provided for Hernandez.

72. Since I was able to corroborate much of what Montoya provided me, I submit that it is reasonable that the information provided by Montoya was accurate and truthful. Montoya appeared to have provided reliable information and I am not aware of any false information Montoya has provided.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

73. On April 13, 2021, FBI Special Agent (SA) K.C. Hughes served an administrative subpoena on T-Mobile. On April 23, 2021, T-Mobile returned the results of the subpoena and it showed that the phone had been active and was used as recently as April 13, 2021 (the same day as the inquiry). Additionally, the return showed the JOHN CRUZ was listed as the subscriber for the telephone number associated to the DEVICE.

74. I have conducted numerous surveillances on CRUZ in the last three months. Each time I have conducted surveillance on CRUZ, I have relied on the data provided by T-Mobile to find CRUZ's location as it relates to the phone. Each time the data leads me to CRUZ's location. As such, I submit that the DEVICE is in CRUZ's possession, and I have no information that would suggest it is being carried by or used by anyone else other than CRUZ.

75. Your Affiant believes there is probable cause to believe that the Device contains evidence, fruits, and instrumentalities of the following violations: 21 U.S.C. § 841 (Possession With Intent to Distribute and Distribution of a Controlled Substance) and 846 (Conspiracy to Distribute a Controlled Substance), 18 U.S.C. § 922(g)(1) (Possession of a Firearm and/or Ammunition by a Prohibited Person), and 21 U.S.C. § 843(b) (Use of a Communication Facility to Facilitate a Drug Felony).

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

76. Based on my training and experience, your Affiant knows about the following items, hereinafter and below and in the Attachments "Device."

77. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.   Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text ("SMS") messages, and phone book contacts. Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

78. In addition, I know in my training and experience that mobile device manufactures have a fingerprint recognition feature that the device's user can program and use to unlock the device. The fingerprint recognition feature is an alternative to typing in a password to unlock the device, and most devices simultaneously allow both methods of unlocking the device. For instance, I know that Apple, Google Pixel Google Pixel XL, Samsung, LG, HTC and other manufacturers phones have a fingerprint sensor that can be used to unlock the device. The mobile device described in Attachment A is a Samsung brand device.

79. Similarly, in my training and experience I know that some applications loaded onto mobile devices or other electronic devices may be secured by the user with a thumbprint or fingerprint. Common among these types of applications are applications such as mobile banking apps or other financial applications, password storage applications, and secure communications apps, among others.

80. The passcode or password that would unlock the DEVICE is not known to law enforcement. Thus, it will likely be necessary to press the finger(s) of the owner (i.e. John CRUZ) of the DEVICE to the device's fingerprint recognition sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant DEVICE via fingerprint recognition with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able

to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

81. As described in more detail above, law enforcement has confirmed that the DEVICE is associated with CRUZ because he has been in the same location as the phone during surveillances, four separate individuals have stated that they call or text with the phone associated to 719-406-0980, and he is listed as the subscriber to that phone number. Based on these facts and my training and experience, it is likely that John CRUZ is the owner and primary user of the DEVICE, and thus, that his fingerprints are among those that are able to unlock the device via the fingerprint recognition feature.

82. Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of CRUZ to the Touch ID sensor of the DEVICE for the purpose of attempting to unlock the device via fingerprint identification in order to search the contents as authorized by this warrant.

83. Based on my knowledge, training, and experience, your Affiant knows that computers and digital storage devices can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

84. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

85. There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

   1) Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   2) Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

   3) Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system

data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

4)    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

86. *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the DEVICE that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICE was used, the purpose of the use, who used the DEVICE, and when.  There is probable cause to believe that this forensic electronic evidence might be on the DEVICE because:

a.    Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

b.    Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.    A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

87. Your Affiant knows that when an individual uses an electronic device to aid in the commission of a crime, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  Specifically, with drug dealers, electronic devices could be used to communicate a plan, communicate price and quantity, and designate a location for which a narcotics transaction will take place.  In the case involving this Device, your Affiant is aware that four separate individuals have stated that they communicate with CRUZ in order to conduct narcotics transactions.  Communications between the parties both before and after are likely to have occurred using electronic devices such as the DEVICE, as it was CRUZ's cellular phone.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain messages and content related the purchasing and sale of narcotics and the conspiracy committed by other parties both before and after the purchase or sale of narcotics.

88. Your Affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

89. A single compact disk can store dozens of images and hundreds of pages of text.  The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years.  Thumb drives with a capacity of 32 gigabytes are not uncommon.  Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon.  These drives can store thousands of images and videos at very high resolution.  Magnetic storage located in host computers adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country.  Once this is done, there is no readily apparent evidence at the "scene of the crime".  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

90. *Need to review evidence over time and to maintain entirety of evidence.*  Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data

fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum. Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original. In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time. As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

91. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device consistent with the warrant. The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device or information from a copy of the Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device to human inspection in order to determine whether it is evidence described by the warrant.

## MODUS OPERANDI OF DRUG TRAFFICKING ORGANIZATIONS

92. I know, based on training and experience, as well as from information relayed to me during the course of my official duties:

   a.   That a significant percentage of heroin and methamphetamine imported into the United States, currently enters the United States domestic market at various points along the Southwest border of the United States, and is then transported to various cities throughout the United States for retail distribution. Furthermore, I know that the importation, transportation, and distribution of heroin and cocaine are controlled by a number of well-organized and sophisticated drug trafficking organizations. I also know that drug trafficking organizations use couriers to transport drugs by vehicle from Mexico to various distribution centers in the United States; they use couriers to transport cash proceeds of drug sales from points of

distribution in the United States back to Mexico, where the proceeds are laundered; and they use "stash houses," premises in which they warehouse large quantities of narcotics prior to their distribution.

b.      That members of these organizations routinely utilize communication facilities including cellular telephones calls, electronic text messaging, and messaging applications accessible on cellular telephones, to communicate with other organization members in furtherance of their illegal goals.  During the course of these electronic communications, organization members commonly use coded language and references and/or encryption in an effort to elude law enforcement detection. Based on training and experience, I know that narcotics traffickers commonly use multiple, prepaid, or "throw away" cellular telephones to avoid detection and elude law enforcement, and said traffickers also change cellular phones frequently or use multiple cellular phones to avoid detection by law enforcement officials.

c.      That drug dealers use cellular phones and other communication devices, in which they maintain names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization and customers of narcotics.

d.      That drug trafficking organizations store information pertaining to drug trafficking activities on electronic devices, including cell phones, computers, and removable storage media. I further know, based on my training and experience, as well as from information relayed to me during the course of my official duties, that drug trafficking organizations often retain, for long periods of time, such electronic documents and devices, in order to maintain a record of contacts, accounts, income, expenditures, assets, and drug-related debts.

e.      That narcotics traffickers routinely "rotate" electronic devices, including cell phones, in order to avoid detection by law enforcement. For example, a narcotics trafficker may possess multiple cell phones and alternate the use of the cell phones on a weekly or monthly basis, before rotating to another cell phone. Based on training and experience, I know that narcotics traffickers often retain possession of previously-used cell phones, even though such phones are no longer utilized in furtherance of narcotics trafficking.  Based on training and experience, I know that, while such phones may no longer be used for narcotics trafficking activities, the devices often contain electronic data, including call records, contact information, text messages, email, photos, video, and more, which can be evidence of past criminal activity.

f.      That when drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, cashier's checks, money orders, wire transfers, and the like.  Based on training and experience, I know that evidence of such financial instruments, accounts, and other methods of "laundering" drug proceeds may be stored on digital devices, such as cell phones and computers.  I further know that narcotics traffickers often store

electronic copies of records and receipts to such financial transactions on digital devices, such as cell phones.  My colleagues and I have seen, for instance, photographs of money orders, tracking numbers, and cash.

g.    That it is common practice for large scale narcotics traffickers to travel to their purchase and distribution areas to facilitate their trafficking; that after purchasing drugs, narcotics traffickers will transport or cause to be transported narcotics to areas in which they will distribute the drugs; and that methods of transportation include commercial airlines, private airplanes, trains, buses, and rental and private automobiles. I further know that narcotics traffickers often store electronic copies of records and receipts to such travel on digital devices such as cell phones. Similarly, geolocation information stored on devices also may reveal travel and patterns of travel material to the distribution of the controlled substances to obtain and redistribute.

h.    That drug traffickers take or cause to be taken photographs or videos of themselves, their associates, their property, and their product; and that these traffickers often maintain these electronic images stored on digital devices such as cell phones.  One purpose for doing so appears to be to show and confirm they are in possession of the product they seek to distribute.

i.    That drug trafficking organizations maintain a variety of documents related to drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, apartment rental agreements, cell phone bills, passports, photographs, credit card bills, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such organizations. I further know that narcotics traffickers often store digital versions of such documents in electronic devices such as cell phones.  My colleagues and I are also aware that more and more commonly such records exist only in electronic form as people more generally move from paper to electronic records to conduct the daily affairs of their life.

j.    There are many reasons why drug traffickers maintain digital evidence for long periods of time. The evidence may be innocuous at first glance (e.g., electronic versions of financial, credit card, and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, videos and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, records relating to safe deposit boxes, and computer hardware and software), but have significance and relevance when considered in light of other evidence. The drug trafficker may no longer realize he/she still possesses the evidence on a digital device or may believe law enforcement could not obtain a search warrant to search the device and seize the evidence. The drug trafficker may also be under the mistaken belief that he/she has deleted, hidden, or further destroyed any evidence stored on a digital device. However, that evidence may still be retrievable by a trained forensic computer expert.

    k.     That drug traffickers are increasingly using computer hardware and software to communicate with co-conspirators and to facilitate the financial transactions associated with both the narcotics deals themselves and with the laundering of the related proceeds. Computer hardware and software may contain spreadsheets of suppliers and buyers, financial records, bank account records, criminal contacts and other information relevant to the investigation of the criminal enterprise.

    l.     Finally, I am aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data). Rule 41, Fed.R.Crim.P., permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime.

## **CONCLUSION**

93. Four interviews of cooperating individuals were conducted over a span of several months. These four cooperating individuals were unaware of the information others had already provided, and commonly stated that CRUZ is a drug dealer, and keeps drugs and guns within his residence. SOI1 was able to clearly identify the current residence of CRUZ, and has recently seen guns, drugs, and cash within that current residence.

94. I have not been able to identify a legitimate source of income or a legitimate employer for CRUZ. CRUZ has not been observed during physical surveillance going to a job, and his phone location data does not suggest he reports to a regular place other than the current location.

95. CRUZ has no reported wages from 2016 to 2021, but still is able to afford rent, pay for storage units, own multiple vehicles, pay for a cellular phone, and is reportedly in possession of large amounts of cash.

96. All four cooperating individuals corroborate that CRUZ's phone number is 719-406-0980 and that they use that phone number to contact CRUZ in order to conduct narcotics transactions.

97. Due to the location data provided by T-Mobile, I have confirmed that CRUZ is physically present in the same location as the phone using physical surveillance.

98. CRUZ is the listed subscriber to the phone number according to T-Mobile.

99. Therefore, your Affiant respectfully requests that the Court issue a search warrant to seize and search the DEVICE, and more fully described in **Attachment A**, to seize the items described in **Attachment B**.




*s/Marcus Juliano*
Marcus Juliano
Task Force Officer, Federal Bureau of Investigation

Sworn to and subscribed by reliable electronic means this ___1st___ day of September, 2021


HON. N. REID NEUREITER
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO


**This affidavit was reviewed and submitted by Daniel McIntyre, Assistant United States Attorney.**